IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

RENZIE QUEEN,                              )
                                          )
                Plaintiff,                )
                                          )
        v.                                )    Civil Action No. 09-043-GMS
                                          )
MICHAEL J. ASTRUE,                        )
Commissioner of Social Security,          )
                                          )
                Defendant.                )
                                          )

**MEMORANDUM**

I.   **INTRODUCTION**

Plaintiff Renzie K. Queen, Jr. ("Queen") brings this action under 42 U.S.C. § 405(g) for

review of the Commissioner's final decision denying his claim for disability insurance benefits

("DIB") and supplemental security income ("SSI") under titles II and XVI of the Social Security

Act. 42 U.S.C. §§ 401-433, 1381-1383f.

Queen filed DIB and SSI applications on August 25, 2005, alleging disability since

October 18, 2004 due to back and neck problems. (D.I. 13 at 128-32, 155, 403-08.) The

Delaware Disability Determination Service denied Queen's claim for benefits initially and upon

reconsideration. (*Id.* at 90-91, 112-25, 393-94.) At Queen's request, administrative law judge

("ALJ") Judith Showalter held a hearing on June 22, 2007 during which Queen, who was

represented by counsel, and a vocational expert testified. (*Id.* at 43-89, 110.)

In a decision dated September 28, 2007, the ALJ found that Queen was not disabled

under the Social Security Act. (D.I. 13 at 16-29.) The Appeals Council denied Queen's request

for review (*id.* at 5-9, 411-19), making the ALJ's decision the Commissioner's final

determination. *See* 20 C.F.R. §§ 404.1481, 416.481. Having exhausted his administrative

remedies, Queen filed this civil action. Presently before the court are the parties' cross-motions

for summary judgment. For the reasons that follow, the court will (1) grant in part and deny in

part the plaintiff's motion for summary judgment, (2) deny the defendant's motion for summary

judgment without prejudice, (3) vacate the ALJ's decision, and (4) remand this matter to the ALJ

for further proceedings consistent with this memorandum opinion.

## II.   BACKGROUND

Queen, a high school graduate, was 45 years old on the alleged disability onset date. (D.I.

13 at 28.) His most recent past relevant work was as a construction worker, doing heavy lifting

and laying gas pipe. (*Id.* at 51.) Prior to that, Queen worked on the kitchen staff at the

University of Delaware and as a custodian for the State of Delaware. (*Id.* at 51-52.)

### A.   Relevant Medical Evidence

#### 1.   Glasgow Medical Center

Queen reports a history of back and neck problems stemming from two automobile

accidents. The first accident occurred on October 18, 2004, his alleged disability onset date.

(D.I. 13 at 207-08.) On October 20, 2004, Queen was treated at Glasgow Medical Center for

neck and left-sided mid-back pain and diagnosed with left trapezius strain and left lumbar strain.

(*Id.*) He was advised to apply heat and prescribed pain medication, a muscle relaxant, and

chiropractic care. (*Id.*)

The second accident occurred on December 4, 2006. (D.I. 13 at 372-73.) Queen

presented at Glasgow Medical Center the following day complaining of back and neck pain. (*Id.*)

The examining physician noted tenderness in Queen's cervical and lumbar paraspinal muscles,

2

but found his deep tendon reflexes normal and his range of motion, sensation, motor, and gait intact. (*Id.* at 373.) A bilateral straight leg raising test elicited no pain. (*Id.*) The examining physician diagnosed lumbar and cervical strain secondary to the motor vehicle accident and prescribed a muscle relaxant, ice, and heat. (*Id.* at 372.)

2.   *Diagnostic Studies*

Between the alleged onset of his disability and the date of the ALJ's decision, Queen received treatment for his neck and back pain from James Fusco, D.C., a chiropractor, and Peter Bandera, M.D., a physical medicine specialist. (D.I. 13 at 224-42, 251-350, 355-71, 376-90.) Queen underwent numerous diagnostic studies at their request. On December 29, 2004, an MRI of his cervical spine revealed a right paracentral disc herniation with an annular tear at the C4-5 level and a spondylotic bulging annulus at C3-4. (*Id.* at 211.) An MRI of his lumbar spine on the same date showed a spondylotic annular bulge with degenerative disc disease at L3-4, causing some left foraminal stenosis. (*Id.* at 212.)

In November 2004, x-rays of Queen's cervical spine revealed spinal biomechanical alterations, uncovertebral and facet arthrosis at the mid and lower cervical spine, and mild spondylosis with slight disc narrowing. (D.I. 13 at 210.) X-rays of his lumbar spine on the same date showed spinal biomechanical alterations, facet arthrosis at the mid and lower lumbar spine, and mild spondylosis with disc narrowing at the L3 and L5 levels. (*Id.* at 209.) In January 2005 and February 2005, electromyography and nerve conduction ("EMG/NCV") studies on Queen's lumbar and cervical spine produced results consistent with radiculopathy involving the left L4 nerve root and the right C5 nerve root. (*Id.* at 231, 233.)

In or around December 2005, a second MRI identified an annular bulge at L3-4 and

3

degenerative disc changes. (D.I. 13 at 224.) A third MRI of Queen's cervical spine in April

2007 showed small focal disc protrusions with adjacent spurs at C4-5 abutting the right hemicord

and contributing to mild canal narrowing, degenerative disease causing mild canal narrowing at

C3-4, and degenerative disease causing severe neuroforaminal impingement at C6-7. (*Id.* at

352-53.) A simultaneous lumbar spine MRI revealed disc dessication at L2-3 and L3-4 with

small focal disc protrusions and annular fissures at L2-3 and L3-4, causing no significant

displacement of the nerve roots. (*Id.* at 354.)

     *3.     Records of Peter Bandera, M.D., Treating Physician*

     Queen met with Dr. Bandera on approximately a monthly basis from December 2004 to

April 2007. (D.I. 13 at 224-42, 333-50, 376-90.) At his initial visit on December 27, 2004, Dr.

Bandera noted neck and back spasms, positive bilateral Spurling's maneuvers, positive straight

leg raising at 46 degrees, limited range of motion at the extremes, and bilateral tenderness at

L3-S1. (*Id.* at 234.) Queen's motor strength, sensation, and reflexes were grossly intact. (*Id.*)

Dr. Bandera diagnosed cervical/lumbosacral syndrome with traumatic

strain/sprain/radiculopathy, and ruled out intervertebral disc dysfunction/peripheral nerve injury.

(*Id.*) He prescribed outpatient therapy and medication, and advised Queen to remain out of work.

(*Id.*)

     Throughout 2005, Dr. Bandera noted spasms, muscle guarding, and tenderness in

Queen's neck and back, limited range of motion, and positive bilateral Spurling's maneuvers.

(D.I. 13 at 224-33.) Queen's reflexes, sensation, and motor strength, however, remained grossly

intact. (*Id.*) Straight leg raising tests generated positive responses until July 6, 2005, after which

no pain was elicited. Dr. Bandera continued to prescribe pain medication. He also administered

4

facet block injections to Queen's cervical spine on February 9, March 21, and April 25, 2005. (*Id.* at 229-32.) These injections provided Queen some degree of short-term relief. (*Id.*) Queen's diagnosis remained unchanged until October 12, 2005, when Dr. Bandera made additional diagnoses of cervical disc herniation with radiculopathy and traumatic expression of lumbar spondylosis. (*Id.* at 225.) In December 2005, Dr. Bandera began a separate course of facet block injections to Queen's lumbar spine. (*Id.* at 224.) Dr. Bandera's continued opinion was that Queen should not work.

Dr. Bandera's treatment and physical examination findings remained essentially unchanged through 2006 and 2007. (D.I. 13 at 343-50.) He performed repeat lumbar facet block injections on January 16, 2006. (*Id.* at 350.) Queen reported a positive response to these injections on an "incremental basis," but also indicated that daily activities continued to give him problems. (*Id.* at 349.) On July 10, 2006, Dr. Bandera noted that Queen had difficulty changing position from sit to stand. (*Id.* at 345.) Following Queen's second automobile accident, Dr. Bandera noted associated spasm/muscle guarding in the neck, back, and trapezius (left greater than right). (*Id.* at 343.) He diagnosed cervical/lumbar strain/sprain and radiculopathy. (*Id.*)

During the relevant period, Dr. Bandera offered several opinions that Queen remain out of work. In a Multiple Impairment Questionnaire dated March 23, 2007, he listed a poor prognosis. (D.I. 13 at 334.) Queen's primary symptom—pain—was rated at 7 to 8 on a 10-point scale. (*Id.* at 335-36.) Dr. Bandera further concluded that: (1) Queen could sit for only 3 total hours and stand or walk for 3 total hours in an 8-hour workday; (2) Queen would need to stand and stretch for 5 to 10 minutes of every hour spent sitting; (3) Queen's symptoms frequently interfered with his attention and concentration; (4) Queen would require 2 to 3 unscheduled

breaks lasting 5 to 10 minutes at unpredictable intervals each day; and (5) Queen should only occasionally lift or carry objects weighing 5 pounds or less, and should never lift or carry objects heavier than 5 pounds. (*Id.* at 336-39.) Dr. Bandera supported these opinions by reference to MRI results, as well as his own clinical findings of spasms and muscle guarding. (*Id.* at 334-35.) Dr. Bandera gave a similar opinion in a Medical Certification form completed for Delaware Health and Social Services on April 12, 2007, in which he concluded Queen would be unable to work in any capacity for 6 to 12 months. (*Id.* at 384.)

Dr. Bandera again stated a poor prognosis for Queen in a Spinal Impairment Questionnaire dated June 19, 2007. (D.I. 13 at 377-83.) In this report, Dr. Bandera concluded that: (1) Queen could sit for only 2 total hours and stand or walk for 2 total hours in an 8-hour workday; (2) Queen would need to stand and stretch 3 to 5 times per hour when sitting; (3) Queen's symptoms frequently interfered with his attention and concentration; (4) Queen would require daily unscheduled breaks lasting anywhere from 30 minutes to 2 hours; and (5) Queen should never lift or carry objects of any weight. (*Id.* at 380-82.) To support his opinions, Dr. Bandera cited MRI and EMG results, in addition to clinical findings of spasms, trigger points, limited range of motion, positive Spurling's maneuvers, and tenderness. (*Id.* at 377-79.)

### 4.    *Records of James Fusco, D.C., Treating Chiropractor*

Dr. Fusco began treating Queen shortly after his first accident on October 21, 2004. (D.I. 13 at 252.) Queen reported discomfort in his neck and lower back. Dr. Fusco noted tenderness in his paracervical and paralumbar musculature, and diagnosed myofascitis, lumbar spine strain/sprain, and cervical spine strain/sprain. (*Id.*) Queen was treated with spinal manipulation, given a lumbar support and lumbar cushion, and administered electric muscle stimulation and hot

6

packs. (*Id.*) Dr. Fusco opined that Queen was totally incapacitated at the time. (*Id.* at 314.)

Over the following nineteen months, Dr. Fusco recorded subjective complaints and objective findings virtually identical to Queen's initial visit.[1] (D.I. 13 at 251-332, 355-71.) His assessment of Queen's condition and his treatment plan were also unchanged, apart from the addition of massage therapy in January 2005. (*Id.*) In November 2005, Queen reported "great relief with treatment" and an overall decrease in the intensity and frequency of his pain. (*Id.* at 331.) At this visit, Dr. Fusco also reported that Queen had full range of motion in his lumbar and cervical spines, and recommended daily home stretching. (*Id.* 331.) Despite this, Dr. Fusco completed numerous certifications during the relevant period stating that Queen could not work. (*Id.* at 251, 311-23, 326-28, 356-60.)

In a narrative regarding Queen's condition dated October 4, 2005, Dr. Fusco observed that while Queen had made "overall improvement" in his condition, he continued to exhibit signs and symptoms of cervical and lumbar strain/sprain, a C4-5 disc herniation, and myofascitis. (D.I. 13 at 361-62.) He further reported that Queen had sustained a "partial permanent impairment of the cervical and lumbar spines[.]" (*Id.* at 362.) Dr. Fusco supported his opinions by citation to Queen's subjective complaints of neck and low back pain that interfered with his sleep, as well as objective x-ray and MRI results. (*Id.* at 361.)

5.    *State Agency Physician Opinions*

On December 5, 2005, M.H. Borek, M.D., a state agency physician, reviewed Queen's medical records to assess his residual functional capacity ("RFC"). (D.I. 13 at 216-23.) Dr.

---

[1] Queen saw Dr. Fusco multiple times per week from December 2004 through October 2005. After October 2005, Dr. Fusco treated Queen only once a week.

Borek concluded that Queen: (1) could lift 20 pounds occasionally and 10 pounds frequently; (2) could stand and/or walk for at least 2 hours and sit for about 6 hours during an 8 hour workday; (3) could use his arms frequently, but not constantly, for pushing, pulling, reaching, handling, and fingering; (4) could perform postural movements occasionally; and (5) should avoid concentrated exposure to extreme cold and vibrations. (*Id.* at 217-20.) On February 28, 2006, a second state agency physician, V.K. Kataria, M.D., reviewed the record and confirmed Dr. Borek's RFC assessment. (*Id.* at 243-50.)

## B. Hearing Testimony

### 1. Renzie Queen

At the administrative hearing, Queen testified that he stopped working as a result of neck and back pain resulting from the October 2004 automobile accident. (D.I. 13 at 52-53.) He described daily neck pain at the level of 8 on a 10-point scale, and limitation in turning and nodding his head. (*Id.* at 56.) He described his back pain–which he said radiates to his legs "all the time"–as 8 to 9 on a 10-point scale. (*Id.* at 58.) He also recounted associated back spasms, stiffness, and itchy feet. (*Id.*) Queen further testified to suffering headaches an average of 5 days per week. (*Id.* at 59.) He rated the pain from his headaches as 7 on a 10-point scale, which he attempts to alleviate with over-the-counter pain medication. (*Id.* at 59-60.) Queen also stated that his medications make him sleepy and/or nauseous if taken without food. (*Id.* at 60.)

Concerning his exertional capacity following the accident, Queen testified that he is able to walk for 1 hour, stand for 1 to 2 hours, sit for 1 hour, lift 10 pounds, and slowly bend, kneel, and stoop. (D.I. 13 at 61-62.) He also stated that he can climb stairs and use his hands without limitation. (*Id.*) Queen further admitted the ability to take care of his personal hygiene, prepare

8

simple meals like sandwiches or microwaved food, walk around the yard, sweep briefly, and drive for simple errands. (*Id.* at 63-67.)

## 2. *The Vocational Expert*

The vocational expert ("the expert") first testified that Queen has no current skills that would transfer to jobs with lower levels of exertion. (D.I. 13 at 81.) The expert was then asked to assume a hypothetical individual of Queen's age, education, and past work who was limited to light or sedentary work of a simple and unskilled nature, limited in pushing and pulling with the upper extremities, limited to occasional postural activities, limited to frequent rather than constant reaching, handling, and fingering, and who needed to avoid concentrated exposure to extremes in cold. (*Id.* at 81-82.) While the expert opined that such an individual could not perform any of Queen's past relevant work, the expert did identify a number of other jobs such an individual could perform. These included the light-duty positions of recreation aide, shipping and receiving weigher, and router, and the sedentary positions of food and beverage order clerk, addressor, and call-out operator. (*Id.* at 82-83.) The expert noted that all these jobs can be performed with an option to sit or stand. (*Id.* at 83.) When asked by Queen's counsel to assume an additional limitation that the individual would miss work more than three times per month, however, the expert testified that no work would be available. (*Id.* at 84.) The expert also stated that an individual unable to lift 5 pounds would be unemployable even in sedentary jobs, the lowest level of exertional work. (*Id.* at 85-86.)

## C. The ALJ's Findings

The five-step disability evaluation performed by ALJ Showalter requires the following sequential analysis:

9

[The Commissioner] determines first whether an individual is currently engaged in substantial gainful activity. If that individual is engaged in substantial gainful activity, he will be found not disabled regardless of the medical findings. 20 C.F.R. § 404.1520(b). If an individual is found not to be engaged in substantial gainful activity, the [Commissioner] will determine whether the medical evidence indicates that the claimant suffers from a severe impairment. 20 C.F.R. § 404.1520(c). If the [Commissioner] determines that the claimant suffers from a severe impairment, the [Commissioner] will next determine whether the impairment meets or equals a list of impairments in Appendix I of sub-part P of Regulations No. 4 of the Code of Regulations. 20 C.F.R. § 404.1520(d). If the individual meets or equals the list of impairments, the claimant will be found disabled. If he does not, the [Commissioner] must determine if the individual is capable of performing his past relevant work considering his severe impairment. 20 C.F.R. § 404.1520(e). If the [Commissioner] determines that the individual is not capable of performing his past relevant work, then he must determine whether, considering the claimant's age, education, past work experience and residual functional capacity, he is capable of performing other work which exists in the national economy. 20 C.F.R. § 404.1520(f).

*West. v. Astrue*, C.A. No. 07-158, 2009 WL 2611224, at \*5 (D. Del. August 26, 2009) (citing

*Brewster v. Heckler*, 786 F.2d 581, 583–84 (3d Cir. 1986)). Based on the factual evidence and

the testimony of Queen and the vocational expert, the ALJ determined that Queen was not

disabled, and therefore not entitled to DIB or SSI benefits. (D.I. 13 at 29.) The ALJ's findings

are summarized as follows:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2009.

2. The claimant has not engaged in substantial gainful activity since October 18, 2004, the alleged onset date (20 C.F.R. §§ 404.1520(b), 404.1571 *et seq.*, 416.920(b) and 416.971 *et seq.*).

3. The claimant has the following severe impairments: cervical and lumbar degenerative disc disease (20 C.F.R. §§ 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

10

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work except he is limited in pushing and pulling with the upper extremities and is only occasionally able to climb stairs, ramps, ladders, ropes, or scaffolds and occasionally balance, stoop, kneel, crouch, and crawl. He is limited to frequent rather than constant reaching, handling, and fingering and needs to avoid concentrated exposure to extreme cold and vibration. He is limited to simple, unskilled work due to the side affects of his medication.

6. The claimant is unable to perform any past relevant work (20 C.F.R. §§ 404.1565 and 416.965).

7. The claimant was born on May 7, 1959 and was 45 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 C.F.R. §§ 404.1563 and 416.963).

8. The claimant has at least a high school education and is able to communicate in English (20 C.F.R. §§ 404.1564 and 416.964).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 C.F.R. Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 C.F.R. §§ 404.1560(c), 404.1566, 416.960(c), and 416.966).

11. The claimant has not been under a disability, as defined in the Social Security Act, from October 18, 2004 through the date of this decision (20 C.F.R. §§ 202.1520(g)).

(D.I. 13 at 21-29.)

## III.    STANDARD OF REVIEW

### A.    Motion for Summary Judgment

Both parties filed motions for summary judgment pursuant to Federal Rule of Civil

Procedure 56(c). In determining the appropriateness of summary judgment, the court must

11

review the record as a whole and "draw all reasonable inferences in favor of the nonmoving party, [but] may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) (citations omitted). If the court determines that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law, summary judgment is appropriate. *See Hill v. City of Scranton*, 411 F.3d 118, 125 (3d Cir. 2005) (quoting Fed. R. Civ. P. 56(c)).

## B. Review of the ALJ's Findings

The court must uphold the Commissioner's factual decisions if they are supported by "substantial evidence." 42 U.S.C. §§ 405(g), 1383(c)(3). Substantial evidence is not a "large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552, 564-65 (1988) (internal citation omitted). *See also Ventura v. Shalala*, 55 F.3d 900, 901 (3d Cir. 1995) (defining substantial evidence as "more than a mere scintilla") (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). Credibility determinations are likewise the province of the ALJ, and should be disturbed on review only if they are not supported by substantial evidence. *See Pysher v. Apfel*, No. 00-1309, 2001 WL 793305, at *3 (E.D. Pa. July 11, 2001) (citing *Van Horn v. Schweiker*, 717 F.2d 871, 973 (3d Cir. 1983)). Thus, the inquiry is not whether the court would have made the same factual determination as the ALJ, but whether the ALJ's conclusion was reasonable. In social security cases, the substantial evidence standard applies to motions for summary judgment brought pursuant to Federal Rule of Civil Procedure 56(c). *See Woody v. Sec. of the Dep't of Health & Human Serv.*, 859 F.2d 1156, 1159 (3d Cir. 1988).

## IV. DISCUSSION

12

Queen objects to the Commissioner's determination on three grounds: (1) the ALJ afforded improper weight to his treating physician's opinion; (2) the ALJ relied upon flawed vocational expert testimony in assessing his RFC; and (3) the ALJ failed to properly evaluate his testimony at the administrative hearing. The court agrees with Queen's first two contentions, and concludes the ALJ's decision was not supported by substantial evidence.

## A.    The Treating Physician's Opinion

In determining the proper weight to be given to a medical opinion, the ALJ is required to weigh all the evidence and resolve any material conflicts. *See Richardson*, 402 U.S. at 399. In particular, regarding the weight given to a treating physician's medical opinion, the Third Circuit has stated that "[t]reating physicians' reports should be accorded great weight, especially 'when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time.'" *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999) (quoting *Rocco v. Heckler*, 826 F.2d 1348, 1350 (3d Cir. 1987)). As such, "a court considering a claim for disability benefits must give greater weight to the findings of a treating physician than to the findings of a physician who has examined the claimant only once or not at all." *Mason v. Shalala*, 994 F.2d 1058, 1067 (3d Cir. 1993). Indeed, a treating physician's opinion on the nature and severity of a claimant's impairments is accorded "controlling weight" if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record." *Fargnoli v. Halter*, 247 F.3d 34, 43 (3d Cir. 2001) (quoting 20 C.F.R. § 404.1527(d)(2)).

The ALJ may, however, reject a treating physician's opinion if it is based on "contradictory medical evidence." *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000). In those

13

instances, "[e]ven where there is contradictory medical evidence . . . and an ALJ decides not to give a treating physician's opinion controlling weight, the ALJ must still carefully evaluate how much weight to give the treating physician's opinion." *Gonzalez v. Astrue*, 537 F. Supp. 2d 644, 660 (D. Del. 2008); *see also* Social Security Ruling 96-2p, 1996 WL 374188, at \*4 (July 2, 1996) (noting that "a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.").

In this case, the ALJ's rejection of Dr. Bandera's opinion was not supported by substantial evidence. Dr. Bandera recorded opinions concerning the nature and severity of Queen's impairments on two separate questionnaires completed within months of the administrative hearing. (D.I. 13 at 334-41, 377-83.) These opinions are well-supported by a battery of diagnostic results, including an EMG/NCV of the lower extremities consistent with radiculopathy of the L4 nerve root, an EMG/NCV of the upper extremities consistent with radiculopathy of the C5 nerve root, and at least two MRIs, the last of which revealed degenerative disc disease, mild canal narrowing at C3-4 and C4-5, severe neuroforaminal impingement at C6-7, and disc dessication at L2-3 and L3-4. (*Id.* at 231-33, 352-54.) They are further supported by clinical findings of spasms, muscle guarding, limited motion in the cervical and lumbar spines, trigger points, and positive Spurling's maneuvers. Dr. Bandera collected these findings over a course of treatment spanning two and a half years and at least 18 examinations, the records of which were before the ALJ. (*Id.* at 224-34, 342-50.) His opinion is corroborated by that of Queen's chiropractor, Dr. Fusco, who treated Queen for 19 months, examined him over 150 times, and opined that Queen had sustained a "partial permanent impairment of the cervical and lumbar spines" which he predicted would lead to "advanced

14

degenerative osteoarthritic changes." (*Id.* at 252-95, 367-71, 361-62.)

Rather than accepting Dr. Bandera's opinion as corroborated by Dr. Fusco, the ALJ afforded "significant weight" to the opinions of state agency consultants Borek and Kataria because "they were based upon a through [sic] review of the evidence and familiarity with Social Security Rules and Regulations and legal standards set forth therein." (D.I. 13 at 27.) Neither Dr. Borek nor Dr. Kataria, however, ever treated or examined Queen. Instead, they reviewed the records available at the time. Inspection of Queen's medical history shows what a poor vantage point this provided. Dr. Borek reviewed the record on December 5, 2005, Dr. Kataria on February 28, 2006. (*Id.* at 223, 250.) Even measuring from Dr. Kataria's later review, these reports predate Queen's final MRI, a second automobile accident aggravating Queen's existing injuries, and a year of treatment by Dr. Bandera. In view of the incomplete record Drs. Borek and Kataria reviewed, the ALJ's justification that Dr. Bandera "did not adequately consider the entire record, including the statements of collateral sources and the objective findings of other treating physicians" rings hollow. (*Id.* at 27.) Indeed, the records and objective findings of Dr. Fusco, Queen's only other treating physician, overwhelmingly *agree* with Dr. Bandera's.

Despite these facts, the Commissioner argues that a number of issues with Dr. Bandera's opinions entitled the ALJ to afford them lesser weight than those of the state agency consultants. The Commissioner first asserts that Dr. Bandera's opinion concerned the ultimate issue of Queen's disability, and as such was entitled to no particular deference. *See* 20 C.F.R. §§ 404.1527(e), 416.927(e) (stating that opinions as to whether a claimant is disabled, unable to work, has impairments that meet or equal the requirements for a listed impairment, or has a particular RFC are dispositive administrative findings reserved to the Commissioner); Social

Security Ruling 96-5p, 1996 WL 374183, at *2 (July 2, 1996) (explaining that a treating source opinion regarding a claimant's disability or RFC is "never entitled to controlling weight or special significance"). Dr. Bandera's reports, however, encompassed far more than the bare conclusion that Queen was disabled. Indeed, the bulk of his reports related to the nature and severity of Queen's impairments, including the length of time he could sit, stand, or walk in an eight hour workday, how often he would need to take unscheduled breaks and for how long, and how many days he would miss from work each month due to his impairments. The ALJ was not free to dismiss these nature and severity opinions simply because they accompanied a separate opinion on disability.

The Commissioner next argues that Dr. Bandera's opinions were conclusory, and therefore not entitled to controlling weight. *See Mason v. Shalala*, 994 F.2d 1058, 1065 (3d Cir. 1993) (stating that "form reports in which a physician's obligation is only to check a box or fill in a blank are weak evidence at best"). As noted above, however, Dr. Bandera specifically cited numerous MRI results, EMG/NCV tests, and other clinical findings in support of his questionnaire responses. Dr. Bandera's credibility is further bolstered by a long and recorded history of treatment. Even if the court did consider Dr. Bandera's opinions conclusory, the opinions of the state agency consultants are no better. Dr. Borek's RFC assessment appears on an eight page, "check a box" form, with only the last page containing any discussion of the evidence. That limited discussion provides no insight into how the evidence supports his particular opinions; it only summarizes the record and states his final assessment. *(See D.I. 13 at*

16

223.) As for Dr. Kataria's assessment, it is only two sentences long.[2]

The Commissioner's final position is that Dr. Bandera's opinions were inconsistent with other substantial evidence in the record. There are two problems with this contention. First, the court is not convinced that substantial evidence contradicted Dr. Bandera. Dr. Bandera's treatment notes, for example, paint a consistent picture of chronic, debilitating pain. While Queen did experience some relief with injections and therapy, his relief was always short-term and never permitted him to return to work. (*See* D.I. 13 at 229-32, 349.) Dr. Fusco's treatment notes are also in step with Dr. Bandera's conclusions. Indeed, apart from a single appointment in November 2005 at which Queen reported "great relief with treatment" (*id.* at 331), Dr. Fusco's copious notes lack any indication of a positive turn in Queen's condition. Nor can the court agree that the findings of Queen's examining physicians detailed above are "unremarkable." (D.I. 22 at 14.) Remarkability aside, the multitude of abnormal findings in the record provide ample basis for Dr. Bandera's opinions. That Queen never required significant increases in his pain medication is similarly insufficient to establish that his condition was "well-controlled." (*Id.*) Queen's complaints of moderate to severe pain, even with medication and injections, were well-supported by his own testimony as well as the notes and reports of his treating physicians. (*See* D.I. 13 at 58, 349, 361-62.)

The larger problem with the Commissioner's inconsistency argument is that, even assuming these bits of evidence to be contradictory and substantial, the ALJ was nonetheless obligated to carefully evaluate the weight of Dr. Bandera's opinion. As discussed above, a

---

[2] The entirety of Dr. Kataria's report reads: "Chart Reviewed [sic], new information reviewed. RFC done by Dr. Borek on 12/05 is AFFIRMED." (D.I. 13 at 250.)

17

treating source's opinion is still entitled to deference even if it is not entitled to controlling weight. Here, the ALJ entirely discredited Dr. Bandera's opinions in favor of the state agency consultants, not only as to aspects of Queen's impairments on which the sources disagreed, but also as to aspects on which the state agency consultants registered no opinion. At least one of Dr. Bandera's uncontested opinions–i.e., how many days of work per month Queen would miss due to his impairments–had the potential to alter the ALJ's final determination (*see* D.I. 13 at 84), yet the court is given no explanation as to why this crucial piece of evidence was discarded. Upon this record, the court cannot find the ALJ's treatment of Dr. Bandera's opinion supported by substantial evidence.

## B. The Vocational Expert's Testimony and the RFC Assessment

Hypothetical questions posed to a vocational expert must set out all of a claimant's limitations and impairments. *See Burns v. Barnhart*, 312 F.3d 113, 123 (3d Cir. 2002) (quoting *Chrupcala v. Heckler*, 829 F.2d 1269, 1276 (3d Cir. 1987)). The ALJ, however, need only convey those limitations that are credibly established. *See Rutherford v. Barnhart*, 399 F.3d 546, 554 (3d Cir. 2005); *Plummer v. Apfel*, 186 F.3d 422, 431 (3d Cir. 1999). When undisputed medical evidence exists of specific impairments that are not included in the hypothetical question, or the RFC assessment on which the hypothetical question was based is flawed, the expert's response is not substantial evidence supporting a determination. *See Burns*, 312 F.3d at 123 (citing *Podedworny v. Harris*, 745 F.2d 210, 217 (3d Cir. 1984)).

Queen argues the ALJ based her RFC assessment exclusively on the findings of the non-examining state agency consultants, resulting in a hypothetical question that did not accurately portray all of his credible limitations and impairments. The court agrees. The ALJ failed to

18

consider the limitation that Queen would miss work more than three times per month. When asked by Queen's counsel at the administrative hearing to assume such a limitation, the vocational expert testified that no work would be available. (D.I. 13 at 84) This limitation was credible as well as potentially dispositive. It was corroborated by Dr. Bandera's consistent response in the questionnaires that Queen's condition would produce "good days" and "bad days," as well as Queen's testimony at the administrative hearing to the same effect. (*See* D.I. 13 at 340, 382, 58.) Additionally, Queen testified that he remained in physical therapy through the hearing date. (*Id.* at 56.) Assuming competitive employment would interfere with this therapy, the possibility of Queen missing work due to his pain seems even more plausible. Finally, neither state agency consultant addressed this possibility in their RFC assessments. Because the ALJ omitted consideration of this limitation without any explanation or discussion, the court finds she lacked substantial evidence to rely upon the vocational expert's resulting testimony that Queen could perform a significant number of jobs in the national economy.

## C. The ALJ's Evaluation of Queen's Credibility

The ALJ is empowered to evaluate the credibility of witnesses. *Van Horn v. Schweiker*, 717 F.2d 871, 873 (3d Cir. 1983). Because the ALJ is charged with observing a witness' demeanor, her findings on credibility are ordinarily treated with deference. *See Reefer v. Barnhart*, 326 F.3d 376, 380 (3d Cir. 2003). While the ALJ must seriously consider a claimant's subjective complaints, it is within her discretion to assign such complaints more or less weight after balancing them against all available evidence. *See* 20 C.F.R. §§ 404.1529, 416.929. The ALJ may not, however, discount a claimant's subjective complaints based only on her own lay assessment of the claimant at the administrative hearing. *See Ferguson v. Schweiker*, 765 F.2d

31, 37 (3d Cir. 1985) (stating that where a claimant's testimony as to pain is reasonably supported by medical evidence, the ALJ may not discount claimant's pain without contrary medical evidence) (citing *Green v. Schweiker*, 749 F.2d 1066, 1070 (3d Cir.1984)); *Frankenfeld v. Bowen*, 861 F.2d 405, 408 (3d Cir. 1988) (finding error in ALJ's rejection of credible medical evidence based solely on observation of claimant at the hearing and testimony as to claimant's daily activities).

In this case, the ALJ found that while Queen's medically determinable impairments could "reasonably be expected to produce the alleged symptoms," his statements regarding the intensity, persistence, and limiting effects of the symptoms were "not entirely credible." (D.I. 13 at 25.) Queen insists the ALJ erred in assessing his credibility by substituting her own lay opinion for the medical evidence and impermissibly relying on her observations of him at the hearing. The court disagrees with this charge for two reasons. First, contrary to Queen's assertions, the ALJ gave balanced consideration to a number of factors in evaluating his credibility, including his daily activities, his treatment history, medical opinions in the record, his appearance and demeanor at the hearing, and his subjective complaints. *(See id.* at 25-27.) Unlike *Ferguson* and *Frankenfeld*, in which the ALJs possessed no credible medical evidence against the claimant's testimony, in this case the ALJ noted a number of clinical findings and state agency consultant opinions that tended to undermine Queen's subjective complaints. *(See id.)* Although insufficient to entirely discredit the opinions of Queen's treating physicians, the ALJ properly relied upon this evidence in partially discounting Queen's testimony.

Second, unlike the opinions of Queen's treating physicians, which were afforded no weight at all, the ALJ did in fact lend Queen's testimony a fair amount of credibility. Indeed, the

20

ALJ accepted Queen's complaints of headaches and depression, despite "minimal clinical evidence" to corroborate or support them, by finding him to have mild difficulties in maintaining concentration, persistence, and pace. (*Id.* at 23.) The ALJ further credited Queen's statements concerning the side effects of his medications by limiting his residual functional capacity to simple, unskilled work when his past employment involved semi-skilled tasks. (*See id.* at 23, 81.) Therefore, because the ALJ did not entirely discredit Queen's testimony and gave acceptable reasons for those portions she did discredit, the court finds this portion of the ALJ's decision supported by substantial evidence.

## V.  CONCLUSION

For the foregoing reasons, the court will (1) grant in part and deny in part the plaintiff's motion for summary judgment, (2) deny the defendant's motion for summary judgment without prejudice, (3) vacate the ALJ's decision, and (4) remand this matter to the ALJ for further proceedings consistent with this memorandum opinion.

Dated: May 20, 2010

CHIEF UNITED STATES DISTRICT JUDGE

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

RENZIE QUEEN,                          )
                                       )
                 Plaintiff,            )
                                       )
         v.                            )   Civil Action No. 09-043-GMS
                                       )
MICHAEL J. ASTRUE,                     )
Commissioner of Social Security,       )
                                       )
                 Defendant.            )
_____)

## ORDER

For the reasons stated in the court's memorandum of this same date, IT IS HEREBY

ORDERED that:

1.    The plaintiff's motion for summary judgment (D.I. 19) is GRANTED IN PART

      and DENIED IN PART.

2.    The defendant's motion for summary judgment (D.I. 21) is DENIED without

      prejudice.

3.    The ALJ's September 28, 2007 decision is VACATED.

4.    This matter be REMANDED for further proceedings.

Dated: May 20, 2010

_____
CHIEF UNITED STATES DISTRICT JUDGE